**Richard Louis Arnold PHILLIPS, Petitioner–Appellant,**

v.

**Jeanne S. WOODFORD, Respondent–Appellee.**

No. 98–99022.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 21, 2000

Filed Oct. 15, 2001

Richard Louis Arnold Phillips, pro se, San Quentin State Prison, San Quentin California, and Donald J. Horvath, Advisory Counsel, Coarsegold, California, for the petitioner-appellant.

Robert Todd Marshall, Deputy Attorney General, Sacramento, California, for the respondent-appellee.

Before: B. FLETCHER, REINHARDT, and KLEINFELD, Circuit Judges.

Opinion by Judge REINHARDT; Dissent by Judge KLEINFELD

REINHARDT, Circuit Judge:

California prisoner Richard Louis Arnold Phillips appeals the district court's denial, without an evidentiary hearing, of his 28 U.S.C. § 2254 habeas corpus petition. We conclude that Phillips has asserted a colorable claim that the combined prejudicial effect· of his counsel's ineffective assistance, and the State's presentation of false testimony regarding the existence of a plea agreement with its chief witness, requires setting aside the findings that rendered him eligible for a sentence of death. Accordingly, Phillips has established his entitlement to an evidentiary hearing on those two claims, and we reverse in part and remand with instructions that the district court conduct such a hearing. We reject Phillips's remaining claims for relief.

## I. Background

### A. Procedural History

Phillips was convicted on January 31, 1980 of the first degree murder of Bruce Bartulis, the attempted murder of Ronald Rose, two counts of robbery, and the personal use of a firearm in the commission of the crimes. The jury also found the special circumstance of murder during the commission of a robbery to be true. On February 1, 1980, following the presentation of the penalty phase, the jurors returned a verdict of death. The California Supreme Court affirmed Phillips's conviction on direct appeal, but reversed his death sentence. *People v. Phillips*, 41 Cal.3d 29, 222 Cal.Rptr. 127, 711 P.2d 423 (1985). After a second penalty-phase trial, some twelve years after the initial verdict, Phillips was once again sentenced to death on March 13, 1992.

In the interim, from 1987 through 1990, Phillips filed four petitions seeking collateral relief in the Madera County Superior Court. Two of those petitions were denied following evidentiary hearings, and the other two were denied without hearings. Phillips presented all four petitions to the Fifth District Court of Appeal, which denied relief. The California Supreme Court denied review of all four petitions.

On March 4, 1992, prior to being resentenced, Phillips filed a federal habeas corpus petition, raising only guilt-phase claims. The district court dismissed the petition without prejudice on two grounds: that entertaining the petition would inter-

fere with ongoing state criminal proceedings with respect to the sentence, *see Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and that Phillips had not exhausted his state remedies. On May 26, 1995, some fifteen years after his conviction, we reversed the district court's dismissal, holding that the extraordinary delay that Phillips had already experienced in seeking review of his constitutional claims justified consideration of his guilt-phase claims even though his death sentence was still under review in the California courts—and would be for another five years. *Phillips v. Vasquez*, 56 F.3d 1030, 1037–38 (9th Cir.1995).

Phillips thereafter filed an amended petition on July 15, 1996, alleging that his trial counsel rendered ineffective assistance, that the prosecution made knowing use of perjured testimony and failed to disclose evidence favorable to the defense, that the State destroyed evidence in bad faith, that he is factually innocent of capital murder, and that cumulative error prejudiced his trial. The State moved for summary dismissal, but its motion was denied on January 14, 1997. Phillips then filed two motions for an evidentiary hearing. The first was denied without prejudice on October 17, 1997, and the second was denied on July 13, 1998, along with Phillips's habeas petition. This appeal followed.[1]

## B. *Facts*

A full statement of the facts developed at trial can be found in the original decision of the California Supreme Court affirming Phillips's conviction on direct appeal. *People v. Phillips*, 41 Cal.3d 29, 222 Cal.Rptr. 127, 711 P.2d 423, 427–30 (1985). The following facts, taken from that opinion, are relevant for purposes of this habeas appeal:

Phillips became involved in a large cocaine deal with Ronald Rose and Bruce Bartulis. Both Rose and Bartulis agreed to invest $25,000 each in order to purchase a significant amount of cocaine. Unable to produce the agreed upon amount of money, Rose ultimately gave Phillips a promissory note for $25,000. The amount apparently included funds to purchase housing insulation in addition to cocaine.

A few months later, Phillips informed Rose and Bartulis that he knew where to obtain stolen insulation. Phillips arranged to meet Rose at a gas station in Fresno, California, in order to exchange cash for the stolen insulation. Rose and Bartulis drove to the station in Rose's 1977 Ranchero. Rose had an unloaded .44 magnum pistol in the vehicle, with some ammunition behind one of the seats. Phillips arrived at the station with his girlfriend, Sharon Colman. After meeting up with Rose and Bartulis, the four proceeded in two cars (Phillips and Colman in a Toyota; Rose and Bartulis in the Ranchero) to a

---

1. While this appeal was pending, Phillips's second death sentence was affirmed by the California Supreme Court on January 24, 2000. On September 27, 2000, the state supreme court denied Phillips's petition for postconviction relief. Phillips thereafter filed motions preliminary to filing a federal habeas petition challenging his sentence in the district court, and a majority of the panel concluded in an unpublished order, with Judge Kleinfeld concurring and dissenting, that a habeas challenge to the sentence constitutes a part of the pending habeas proceeding, the conviction portion of which is now before us. In view of the unique circumstances of Phillips's case and the extraordinary delay that occurred in the state proceedings, rather than postpone our ruling on Phillips's challenge to his conviction until the district court has considered Phillips's sentencing issues, we consider the conviction issues now and reverse in part and remand, so that the two parts of Phillips's habeas proceeding may be considered together and so that any future appeal will present all conviction and sentencing issues at one time.

different location-a vacant lot off of the freeway. Before arriving at the lot, they all stopped at another gas station, where Phillips used the restroom.

Among other things, Colman testified to the following: After leaving the restroom, Phillips walked over to the Ranchero and borrowed matches, although during the time they had been living together (the past two months approximately), Phillips did not smoke. Once the four arrived at the vacant lot, Phillips got out of the Toyota and spoke for some time to Rose and Bartulis through the Ranchero driver-side window. At some point, she heard shots fired and as a result, she looked up and saw Phillips holding a gun. Phillips took Rose's and Bartulis's wallets which contained a total of $120 to $150 and brought them back to the car. He then set the Ranchero on fire using gasoline he obtained from the trunk of the Toyota. Rose, who was still alive, jumped out of the burning Ranchero. Upon realizing that Rose was still alive, Phillips drove the Toyota into Rose and hit him, also cracking the Toyota's windshield. Upon first finding the wallets and again while driving away from the shootings, Phillips lamented not finding more money than he did.

Bartulis died at the scene, but Rose survived despite five gunshot wounds and severe burns. Deputies later found large amounts of burned currency in $100 denominations at the crime locale. Approximately one week later, after warrants were issued for their arrest, Phillips and Colman went to Salt Lake City where Colman had relatives. Phillips was apprehended a few months later by the FBI.

At trial, in addition to Colman's testimony, Rose testified that he had limited memory of the shooting and never actually saw who fired the shots. He recalled that just prior to the gunshots Phillips was alone at the driver's side window, that the shots came from the direction where Phillips was standing, and that Rose heard a male voice close to him while he was being searched.

Phillips's counsel presented an alibi defense. Phillips testified at trial that he was being framed and that he had in fact been at a meeting in Sacramento and then at a disco during the time the crime was committed. Phillips claimed that he lent the Toyota to the "coordinator" of the cocaine purchase, Richard Graybill, who returned it to him damaged, and that he fled to Salt Lake City pursuant to an agreement with Graybill. Defense counsel presented no corroboration for Phillips's alibi, claiming that Phillips feared reprisal if he divulged the identity of the people he had met with in Sacramento.

Phillips now concedes, as he did at his second penalty-phase trial, that his trial testimony was not only deeply unconvincing, but actually false, and that he was in fact present at the crime scene. He alleges that Bartulis was killed in a shoot-out. According to Phillips's declaration, he fired his weapon at Rose and Bartulis only after "he heard the 'click' of a hammer going back on a revolver"; he also declares that he "found a large revolver in Rose's hand after the shooting." Phillips contends that Bartulis was killed not by *his* bullet but by Rose's, and that he will be able to establish as much if given the opportunity to develop facts at an evidentiary hearing. In fact, Phillips argues that evidence currently available—and, more saliently, available to counsel at the time of trial—supports his contention that Bartulis was killed during a shoot-out. He further alleges that the key witness against him, Sharon Colman, and Madera County District Attorney David Minier both lied under oath about the existence and nature of a plea agreement under which Colman would receive lenient treatment in exchange for her tes-

timony that Phillips not only killed Bartulis but that he did so in the course of a robbery, thus rendering Phillips eligible for the imposition of the death penalty. We discuss Phillips's additional factual allegations, as they relate to his claims for relief, below.

## II. Standard for Granting Evidentiary Hearing

 On this appeal, Phillips asks that we direct the district court to afford him an evidentiary hearing on his constitutional claims. The standard governing such requests establishes a reasonably low threshold for habeas petitioners to meet. A habeas petitioner is entitled to an evidentiary hearing if: (1) the *allegations* in his petition would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts. *See, e.g., Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Jones,* 114 F.3d at 1010; *Smith v. McCormick,* 914 F.2d 1153, 1170 (9th Cir.1990). "[W]here a petitioner raises a colorable claim [to relief], and where there has not been a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing." *Id.* (quoting *Harich v. Wainwright,* 813 F.2d 1082, 1090 (11th Cir.1987)). In these circumstances, a petition may be dismissed without a hearing only when it consists solely of conclusory, unsworn statements unsupported by any proof or offer thereof. *Coleman v. McCormick,* 874 F.2d 1280, 1284 (9th Cir.1989) (en banc).

## III. Procedural Issues

### A. Applicability of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)

 It is undisputed that AEDPA's substantive provisions do not apply to this appeal. The Supreme Court has held that AEDPA's amendments to 28 U.S.C. § 2254 apply only to cases filed after April 24, 1996, the statute's effective date. *Lindh v. Murphy,* 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *see also Jeffries v. Wood,* 114 F.3d 1484, 1495–96 (9th Cir.1997) (en banc). Phillips filed his original federal petition on March 4, 1992. Following the district court's dismissal of that petition, we reversed and remanded, and Phillips filed the instant amended petition on July 15, 1996. In these circumstances, we treat Phillips's amended petition—filed after AEDPA's effective date—as part of his earlier, erroneously dismissed petition, and apply pre-AEDPA law. *See Williams v. Calderon,* 83 F.3d 281, 285 (9th Cir.1996).[2]

### B. Exhaustion of State Remedies

 As the district court noted in its order denying the State's motion for summary dismissal, portions of Phillips's

---

**2.** Although Phillips's entitlement to relief is governed by pre-AEDPA law, the Supreme Court has held that AEDPA's provisions regarding the issuance of a certificate of appealability (COA) as a predicate to review in the court of appeals apply to all cases in which the notice of appeal was filed after AEDPA's effective date. *Slack v. McDaniel,* 529 U.S. 473, 482, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000). Phillips's appeal falls within this category. Consistent with *Slack,* we treat Phillips's notice of appeal as a request for a COA. *See id.* We conclude that he has made the requisite "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), with respect to each of the claims he raises on appeal, in that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* at 484, 120 S.Ct. 1595; *see also Schell v. Witek,* 218 F.3d 1017, 1021 n. 4 (9th Cir.2000) (en banc); *Lambright v. Stewart,* 220 F.3d 1022, 1024 (9th Cir.2000). We therefore grant the COA and exercise jurisdiction over these issues.

claims have not been presented to the California Supreme Court, and thus Phillips's petition is, at first glance, a "mixed" one. *See Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). However, the district court correctly concluded that Phillips's claims were nonetheless exhausted because "a return to state court for exhaustion would be futile." As the Supreme Court has made clear, the exhaustion requirement applies "only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125–26 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). "[I]n determining whether a remedy for a particular constitutional claim is 'available,' the federal courts are authorized, indeed required, to assess the likelihood that a state court will accord the habeas petitioner a hearing on the merits of his claim." *Harris v. Reed*, 489 U.S. 255, 268, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (O'Connor, J., concurring).

The district court determined that the California courts would not afford Phillips a hearing on the merits of his unexhausted claims, and therefore held that Phillips had satisfied the exhaustion requirement. The State does not challenge that ruling on appeal.

### C. *Cause and Prejudice*

Phillips is not entitled to a hearing in the district court on his ineffective assistance of counsel claim—specifically, the claim regarding his counsel's failure to present a "shoot-out" defense, *see infra* Part III—unless he demonstrates both cause for his failure to develop this claim in state court and resulting prejudice therefrom. *See Keeney v. Tamayo–Reyes*, 504 U.S. 1, 11, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). The State and the dissent do not contest prejudice but assert that Phillips has not shown "cause."

■ The State in its brief argues that Phillips cannot establish "cause" because he did not present the particular ineffective assistance of counsel claim in either of the two state evidentiary hearings that were conducted. The State fails, however, to address Phillips's subsequent request for a hearing on this specific claim or the state court's failure to afford him the requested hearing. It simply states on several occasions that Phillips failed to develop the facts at one of the earlier hearings. Significantly, the State fails to identify any procedural rule that might have justified a refusal to grant Phillips's request for a hearing at which he could develop separately the facts regarding the "shoot-out" claim.[3]

The dissent essentially makes the same error. It, too, fails to recognize during its basic analysis of the issue that the state court expressly denied Phillips's request to develop facts related to the "shoot-out" ineffective assistance of counsel claim. The State, however, did deny Phillips's express request for a hearing on the "shoot-out" claim and, under Ninth Circuit precedent, the state court's denial of that hearing is sufficient for Phillips to show "cause":

> When a state court denies an evidentiary hearing on a colorable ineffective assistance of counsel claim after proper request, a habeas petitioner has fulfilled the *Tamayo–Reyes* "cause" requirement. Simply put, the state cannot successfully oppose a petitioner's request for a state court evidentiary hearing, then argue in federal habeas proceed-

---

**3.** The state court orders set forth no procedural (or indeed any other) basis for the denial of a hearing on the "shoot-out" issue. Instead, they simply deny Phillips's petitions summarily.

ings that the petitioner should be faulted for not succeeding.

*Correll v. Stewart,* 137 F.3d 1404, 1413 (9th Cir.1998).

Oddly, the dissent relies heavily on another part of *Correll* that discusses a different claim than is discussed in the quoted passage. As to that other claim, the petitioner failed completely to ask for an evidentiary hearing in state court on the ground on which he later sought a hearing in federal court. Accordingly, *Correll* held the other claim barred, unlike the claim as to which an evidentiary hearing *was* requested. Here, Phillips specifically asked the state court for a hearing on the identical issue now before us and the state court denied his request. Thus, the portion of *Correll* quoted above is both applicable and dispositive.

■ Subsequently, the dissent, in an attempt to avoid the dispositive effect of *Correll,* argues that Phillips should have presented the "shoot-out" ineffective assistance of counsel claim at one of the earlier hearings.[4] Our dissenting colleague appears to be hinting at the possibility of a procedural bar to Phillips's claim, although

like the State he relies on no particular state rule. The reason for this is evident. As we noted earlier, the state court, in its order denying Phillips's request for a hearing on his shoot-out-based claim, did not rely on any procedural bar. It is true that at the time of Phillips's request California had certain procedural rules governing both the timeliness of claims on collateral appeal and the filing of successive petitions, but the state court did not cite to any of them. Moreover, even if the state court had relied on one or more such rules, none of them constituted an independent and adequate state ground barring federal review at the time Phillips made his request for a hearing; and the district court so ruled, in a holding that the State does not contest on appeal. In issuing its ruling, the district court simply followed our precedent. This court has previously held in opinions controlling here that California applied both its timeliness rules and its rules governing successive petitions in an inconsistent manner during the time period pertinent to Phillips's proceedings. *See Morales v. Calderon,* 85 F.3d 1387, 1391–93 (9th Cir.1996); *Siripongs v. Calderon,* 35 F.3d 1308, 1317–18 (9th Cir.1994). Any

---

4. The dissent states: "The question that has to occur to anyone reading a case twenty-four years old has to be, 'Why didn't Phillips mention before now that his alibi was a lie, and that his lawyer was a dunce for not presenting his shoot-out defense?' " Dissent at 990. Obviously Phillips did, many years ago. Moreover, the dissent fails to note that the case is twenty-four years old because of errors made by the state court requiring new sentencing proceedings, significant problems in getting accurate sentencing trial transcripts, and the inordinate delay in the state courts' commencement and review of the new proceedings. *See Phillips v. Vasquez,* 56 F.3d 1030, 1032 (9th Cir.1995). Phillips's death sentence was first reversed in 1985. The required new state proceedings in the trial court did not end until approximately twelve years after the initial verdict, and direct review of Phillips's second death sentence did

not conclude until January, 2000. *See supra* note 1. Ineffective assistance of counsel claims are generally brought in collateral proceedings, at which a record can be developed. Phillips commenced his state habeas proceedings in 1988, years before direct review of his appeal had concluded. He requested an evidentiary hearing on his "shoot-out" ineffective assistance of counsel claim approximately two years after the initiation of his state habeas proceedings. No one questions that those proceedings were commenced in a timely manner. Given that Phillips was attempting to develop a host of habeas claims while his case was still on direct appeal, it is hardly surprising that he did not raise all of his collateral claims in his initial post-conviction petition, or that he is not precluded from presenting them in separate petitions. *See infra* page 976.

intimation of a procedural bar to federal review of Phillips's claim is therefore wholly without merit.

Because Phillips was not barred from receiving a state court hearing on his "shoot-out" ineffective assistance of counsel claim by any regularly applied state rule, and because the state court orders offered no reason for the refusal to afford Phillips the evidentiary hearing he requested, the State's denial of an evidentiary hearing with respect to Phillips's claim constitutes "cause" under *Correll*. Accordingly, we proceed to the merits of the claims.

## IV. *Ineffective Assistance of Counsel*

█ Phillips contends that his trial counsel, Paul Martin, rendered ineffective assistance by presenting his patently meritless alibi defense to the jury without investigating any other defenses—notably, the defense that Bartulis was killed during a shoot-out—and that "effective trial counsel in a capital case cannot allow his client to decide without adequate advice upon a hopeless alibi defense which counsel believes is false." Because there has been no state court hearing on Phillips's ineffectiveness claim, "the only question is whether [Phillips] raises a 'colorable' claim of ineffective assistance." *Babbitt v. Calderon*, 151 F.3d 1170, 1177 (9th Cir.1998). In other words, to obtain an evidentiary hearing, Phillips's allegations, if proved, must raise a *colorable claim* that his counsel's performance fell below reasonable standards, as well as a *colorable claim* that, but for counsel's ineffective performance, there is a reasonable probability that the outcome of the proceedings would have been different. To put this appeal in perspective, Phillips does not contend that effective counsel would have secured him an acquittal on the basic charges, but rather that, had a "shoot-out" defense been presented at trial, there is a reasonable probability that the jury would not have found him eligible for the death penalty— as it did when it found him guilty of first degree murder with the special circumstance of having committed that murder during the commission of a robbery. In short, Phillips does not contend that he could not have been convicted on a murder charge, but only that he could not have been found to be death-eligible.

### A. *Deficient Performance*

Phillips alleges that Martin "knew or should have known that an uncorroborated alibi defense was hopeless because there was overwhelming credible evidence that Phillips was the shooter, Phillips's testimony made no rational sense, and Phillips would destroy his credibility by wrongfully refusing to answer questions on cross-examination." Despite what Phillips characterizes as the "hopeless" nature of his asserted alibi defense, Phillips alleges that Martin did not confront him with the obvious deficiencies in his story because Martin had not investigated the facts of the shooting and therefore did not know that there was a viable alternative defense: that Bartulis had been killed in a shoot-out, probably unintentionally, by Rose. Rather, Martin simply provided Phillips with copies of the police reports and asked him for his version of events.

Martin's ineffectiveness is underscored, Phillips contends, by evidence that was in Martin's possession prior to trial, as well as evidence that was easily discoverable, that would have supported the "shoot-out" defense. That evidence consists of: (1) autopsy photographs of Bartulis that show the bullet's trajectory and demonstrate that Phillips could not have fired the fatal shot from where Rose and Colman testified that he was standing, and a declaration by Madera County Sheriff / Coroner

Edward Bates that supports that conclusion; (2) a police report stating that Colman, the State's principal witness, had told one Dr. ReVille that "both parties shot at each other at the same time, shooting out the window shield on [Phillips's] Toyota;" (3) a taped police interview in which Colman said that immediately after the shooting, Phillips reached into the victims' truck and retrieved Rose's gun, thus demonstrating that Phillips knew Rose had a gun and that the gun was accessible rather than hidden; (4) evidence that Graybill, who Phillips contends was present during the shooting, told his companion Tamera Nichols that a "business deal had gone sour" and that "all of a sudden both parties just started shooting each other," and (5) evidence that Graybill told Gary Bishop, another associate of Phillips's, that Graybill had been present at the crime scene and that "all hell broke loose" and Phillips had been "lucky to survive." [5]

Phillips's argument is that a reasonably competent attorney who had access to the above-listed evidence would have recognized the viability of a "shoot-out" defense and discussed that option with his client. He has strong support for that assertion from an unlikely source: Martin himself. During a state-court evidentiary hearing in January, 1990, Martin testified that he "would have considered putting on an alternative defense of self-defense and mutual shoot-out if [he] had Colman's December 28, 1977, statement and the police report indicating Colman had told Dr. ReVille that there had been a mutual shootout." In fact, Martin *did* have that evidence, and the state habeas court made a finding of fact to that effect. Based in part on that finding, Phillips raised his current claim of ineffective assistance of

counsel, alleging that Martin was ineffective for not using the materials in his possession in support of a "shoot-out" defense, and instead presenting a defense he knew had no chance of success. Martin then submitted a declaration, less than a year later, in which he recanted his earlier testimony and insisted that even if he *had* been aware of the evidence in his case file, he would not have considered an alternative defense.

Martin's original statement in the state evidentiary hearing was presented in support of a due process claim challenging the State's alleged failure to disclose exculpatory evidence—a claim that in no way implicated his effectiveness as a lawyer. His subsequent declaration, in contrast, was prepared in response to Phillips's newly asserted ineffective assistance of counsel claim; in the same declaration, Martin asserted: "I did not render Phillips ineffective assistance at trial." Because the district court denied Phillips's petition without a hearing, Martin has never been called upon to testify under oath regarding his contradictory statements; nor has he ever been examined regarding the nature of his consultations with Phillips on this issue.

Equally troubling is Martin's statement, in the same declaration, that he "never thought Phillips's alibi defense had any merit, especially since he was adamant that he was not present even after he had read all the police reports and other documents [Martin] provided him." This statement is critical because Martin's justification for not investigating a "shoot-out" theory was that it "would be both unethical and immoral to knowingly permit [Phillips] to commit perjury." Phillips contends that Martin's statement about

**5.** The fourth and fifth pieces of evidence come from the post-trial declarations of Nichols and Bishop, not from police reports. Phillips contends that "a reasonable investigation by attorney Martin would have lead [sic] to this evidence."

the weakness of the alibi defense shows that he never believed Phillips's story, and that indeed seems to be the most sensible interpretation of Martin's statement; otherwise, his reference to Phillips's "adamance" in the face of the police reports that presented overwhelming evidence of his presence at the crime scene would make little sense.

However, if Martin never believed the alibi defense, then his explanation for failing to pursue an alternative "shoot-out" defense—that it would have been unethical to assist Phillips in committing perjury—cannot be accurate. This apparent contradiction, if proven through testimony, would not be inconsequential. Phillips's ineffectiveness claim "is grounded upon his factual allegation that Martin did not believe his alibi story." His argument is that Martin "reasonably could not rely upon information which Martin believed to be false regardless of the source of such information because false information has zero value." The district court purported to resolve the apparent inconsistency in Martin's statements by finding that Martin *did* believe Phillips's alibi story: "Martin's [state court] declaration [recanting his earlier testimony] *implies* that Martin believed Phillips's account" (emphasis added). A careful review of that declaration reveals no such implication. Moreover, such an implication does not constitute the kind of statement that is ordinarily required for purposes of resolving an important question in an order denying an evidentiary hearing. If a potentially material fact is in dispute, the district court may not rest its denial of an evidentiary hearing, even in part, on a dubious—if not highly implausible—inference it draws from a general recitation of events in order to resolve the disputed factual question.

▮ Phillips has "identif[ied] the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The first question, then, is whether he has raised a colorable claim that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* We have held that "counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994) (emphasis in the original). Counsel's failure to consider an alternative defense cannot be considered "strategic" where counsel has "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision about what defense to offer...." *Id.*

▮ It is undisputed that Martin did not investigate any defense other than the alibi defense that was presented at trial. What makes this case a difficult one is that, in so doing, Martin was simply acting in compliance with his client's own version of events. This is not, however, the first occasion on which we have been called upon to consider an ineffectiveness claim grounded upon a petitioner's contention that his counsel was ineffective for accepting his implausible story rather than conducting a further investigation. In *Johnson v. Baldwin,* 114 F.3d 835 (9th Cir. 1997), the petitioner's counsel failed to investigate his "incredibly lame" alibi defense or to "confront[ ] [the petitioner] with the difficulties of his story." *Id.* at 838, 840. Instead, counsel presented the petitioner's uncorroborated defense that he had not been present at the scene of a rape, despite overwhelming evidence to the contrary. Although, as in Phillips's case, the petitioner's counsel had presented a defense that was consistent with his

client's story, we found that the petitioner had been prejudiced by counsel's ineffectiveness:

> We do not find it anomalous that an attorney who fulfills his or her duty to investigate the facts of a case may discover and need to act upon information contrary to that which the client has furnished. As the facts were found by the state courts, [petitioner] offered [counsel] an uncorroborated denial that, in light of evidence that minimal investigation would have revealed, was utterly unconvincing. [Counsel] was not entitled to stop there, but for all practical purposes, he did.... Had [counsel] confronted [petitioner] with the lack of corroboration for his alibi, and the strength of the defense that no sexual intercourse had occurred, [petitioner] probably would have elected not to lie to the jury. The prejudice from failing to investigate the alibi and confer more fully with [petitioner] is not avoided by the fact the [petitioner] misinformed his attorney.

*Id.* at 840.

The State and the dissent are correct that in *Johnson* the State did not challenge the district court's finding that counsel's performance had been deficient; it argued only that the petitioner had not been prejudiced by the deficiency. *Id.* at 838. However, it is clear that the language quoted above bears directly on both prongs of the ineffectiveness inquiry, and that *Johnson* 's precedential value is not limited to the question of prejudice. The *Johnson* court necessarily evaluated counsel's performance (as well as credited the district court's factual finding) in determining whether such performance prejudiced the petitioner. Were there any doubt of that, it would be dispelled by the court's conclusion: "[T]he effect of Haslett's *objectively deficient trial performance* was 'sufficient to undermine confidence in the outcome' of [petitioner's] trial." *Id.* at 840 (emphasis added). It is important to note that in *Johnson* we granted the writ and ordered a remand for a new trial, whereas here we consider only whether Phillips has satisfied the far less onerous "colorable claim" requirement for obtaining an evidentiary hearing. While it is true that the State's evidence against the petitioner in *Johnson* was "extremely weak," *id.* at 838, that is beside the point. Phillips does not dispute that the evidence of his involvement in the crime is overwhelming. However, as we pointed out earlier, unlike the ineffectiveness claim in *Johnson,* Phillips's claim does not depend on his being innocent. Phillips does not deny that he was present at the crime scene and that he fired his gun at the victims. Nor does he deny that he is guilty of serious offenses. Rather, he contends only that, had Martin investigated and presented a "shoot-out" defense, there is a reasonable probability that he would not have been convicted of the ultimate offense—first degree murder with the special circumstance of robbery—an offense that rendered him eligible for the death penalty.

Contrary to the argument in the dissent, the cases of *Turk v. White,* 116 F.3d 1264 (9th Cir.1997) and *Bean v. Calderon,* 163 F.3d 1073 (9th Cir.1998) do not apply to, and in fact are not inconsistent with, this case. We agree with the dissent that *Turk* held that "once defense counsel reasonably selects a theory of defense, he cannot be held to have rendered deficient performance." Dissent at 992. The dissent misses, however, the necessary prerequisite of effective counsel noted in its very own quotation. *Turk* states that defense counsel does not have an obligation to pursue an alternative, conflicting defense once he *reasonably* selects the defense to present at trial. *See Turk,* 116 F.3d at 1267 ("[O]nce [counsel] reasonably selected

the self-defense theory, his duty to investigate the competency defense, which directly conflicted with the self-defense theory, ended."); *see also Bean,* 163 F.3d at 1082 (stating that counsel made a "reasonable strategic choice" to present an alibi defense at trial). The critical words in *Turk*'s holding are "reasonably selected." Nothing in our holding today conflicts with *Turk.* We hold that Phillips's defense counsel *did not* reasonably select the alibi defense used at trial. In this case, as in *Johnson,* the defense used at trial was not selected on the basis of a reasonable investigation or strategic decision. Martin testified at a state-court evidentiary hearing that he would have presented the alternative defense had he had certain documents in his possession; the state habeas court later made a factual finding that Martin indeed had that information in his possession at the time of the trial. Moreover, by his own admission, Martin believed Phillips's alibi defense to be an unreasonable one. Thus, *Turk* and *Bean* support, rather than conflict with, our finding of a colorable claim of deficient performance.

In sum, we hold that Phillips's allegations, as well as Martin's conflicting statements regarding his reasons for not investigating or presenting a "shoot-out" defense, raise a colorable claim that Martin provided ineffective assistance. We next consider whether Phillips has raised a colorable claim that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

## B. *Prejudice*

 In its brief to this court, the State declined to address the prejudice prong of the *Strickland* inquiry, resting entirely on its argument that Martin's performance was not only competent, but "stellar." Nor does the district court's order denying Phillips's petition contain any discussion of possible prejudice, beyond a single introductory statement that "Martin's conduct [did not] result in prejudice sufficient to undermine confidence in the outcome." Thus, neither the district court nor the State has addressed Phillips's prejudice argument, which he summarizes as follows: "Phillips does not urge he was prejudiced by Martin's performance because he is innocent and would not have been convicted of any crime if a 'shoot-out' defense had been presented at his guilt trial. Phillips's prejudice argument is limited to an attack upon the reliability of the crime for which he stands convicted—first degree murder with special circumstances."

Phillips's claim, in other words, is not that he should have been acquitted, but that he should not have been convicted of an offense that rendered him eligible for the death penalty. Phillips was convicted of first-degree murder, attempted murder, two counts of robbery, and the personal use of a firearm, and the special circumstance of murder during the commission of a robbery was found true by the jury. Phillips contends that, had a "shoot-out" defense been presented, there is a reasonable probability that the jury would not have convicted him of first degree murder or, in the alternative, would not have found the special circumstance true. In either event, Phillips could not have been sentenced to death.

At the time of Phillips's conviction, first degree murder was defined as "[a]ll murder which is perpetrated by means of a destructive device or explosive, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate ... robbery." Cal.Penal Code § 189 (Deering

1978) (effective 1970). The special circumstance found true by Phillips's jury provided that any person convicted of first degree murder must be sentenced to death or life in prison without parole if:

> The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and any of the following additional circumstances exists: ... (3) The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any of the following crimes: ... (i) Robbery, in violation of Section 211.

Cal.Penal Code § 190.2(c)(3)(i) (Deering 1978) (effective August 11, 1977).[6]

According to Phillips, had a "shoot-out" defense been presented, and had the jury credited his account that he fired his weapon only after hearing "the 'click' of a hammer going back on a revolver," or his evidence that the fatal shot was fired by Rose, it could not have found that Phillips had committed a "willful, deliberate, and premeditated" murder. There is a second and equally important reason why, Phillips asserts, the death penalty could not have been imposed upon him had the jury accepted a "shoot-out" theory. He asserts that, even assuming he killed Bartulis, his subsequent taking of property from the two victims, does not, under California law, meet the test for murder committed "in the perpetration of" or "during the commission of" a robbery. Thus, he argues, neither the alternative basis that might support a first-degree murder conviction (i.e., murder committed in the perpetration of a robbery), nor the basis for the special circumstance finding (i.e., murder committed during the commission of a robbery), was present in his case. Because these two contentions rest on an identical legal analysis, we will address them in our discussion of the special circumstance issue.[7]

Penal Code section 190.2(c)(3)—the special circumstance provision found true by the jury—provided that in order for a murder to have been committed "during the commission of" any of the enumerated crimes, a jury was required to find the defendant guilty of the underlying offense listed in the particular special circumstance that was alleged. "Wherever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime."[8] Cal.Penal Code § 190.4 (Deering

---

6. Phillips correctly asserts that no other special circumstance would have applied to him at the time of his conviction; thus, had the jury not found the charged special circumstance true, Phillips could not have been sentenced to death.

7. We note, in this connection, that while a first-degree murder conviction need not be based on a finding that the murder was "willful, deliberate, and premeditated" if the jury finds, instead, that it was committed "in the perpetration of a robbery," the special circumstance finding must be based on *both* elements: the murder must be both "willful, deliberate, and premeditated," *and* it must be committed "during the commission of a robbery."

8. It is not entirely clear whether this language means that a *conviction* for the underlying crime is required (e.g., in circumstances where the statute of limitations has run on the underlying felony). However, the California courts have uniformly agreed that, at the very least, each element of the underlying crime must be proven. *People v. Superior Court*, 183 Cal.App.3d 636, 228 Cal.Rptr. 357, 360 (1986) (discussing the statute of limitations issue as to whether conviction is required, but taking as a given the requirement "that an underlying crime be proved beyond a reasonable doubt.").

1978) (effective August 11, 1977); *see also People v. Morris,* 46 Cal.3d 1, 249 Cal. Rptr. 119, 756 P.2d 843, 851 (1988) ("The inescapable inference .is that the legislature fully intended that the elements of the special circumstance felony must be formally proved"); *People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468, 504 (1980) ("[T]he district attorney correctly told the jurors that in order to find the charged special circumstances to be true they must first find defendant guilty of the underlying crimes of robbery and kidnaping").

Therefore, in order for Phillips to be death-eligible under the charged special circumstance, the jury was required to— and did—find him guilty of robbery, as well as murder. However, had the jury been presented with a "shoot-out" defense—even if it refused to credit his contention that he fired his weapon in outright self-defense—Phillips's contention is that it might not have found him guilty of robbery under section 211.

Section 211 of the California Penal Code defined "robbery" as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal.Penal Code § 211 (Deering 1977). Under that provision, a robbery has not been committed unless the force or fear used to commit the taking was accompanied by intent to rob. "[I]f the larcenous purpose does not arise until after the force has been used against the victim, there is no 'joint operation of act and intent' necessary to constitute robbery." *Green,* 164 Cal.Rptr. 1, 609 P.2d at 501. In this case, if the jury believed that a shoot-out had . occurred, it could well have determined that Phillips did not have the intent to take the money until after the force had already been used, i.e., after the shoot-out had occurred. That is precisely what Phillips

now asserts. He maintains that he took the victims' wallets to remove their identification from the crime scene. Indeed, the vast majority of the victims' money—several thousand dollars—remained in their possession following the crime. The district court acknowledged that "there [was] evidence here that could imply Phillips's motive in taking the wallets and Rose's gun was to prevent identification of Rose and Bartulis," but it found that there was sufficient other evidence that Phillips's primary intent was to rob the victims to defeat his claim of "actual innocence." Had the jury found that Phillips's use of force was unrelated to the theft of property—that instead there had been a shoot-out after which Phillips decided to take the items he took—it would then have been required to find Phillips not guilty of robbery, and consequently not guilty of first degree murder with a special circumstance. In such case, Phillips would have been ineligible for the death penalty.

However, even if the jury had found Phillips guilty of the underlying offense of robbery, it might still have found that the State had not proved the special circumstance. The special circumstance finding does not simply require the jury to conclude that a first degree murder and an enumerated underlying felony have both been committed. The jury must also conclude that the murder was "committed *during the commission of*" the underlying felony—in this case, robbery. Cal.Penal Code § 190.2(c)(3) (Deering 1978) (effective August 11, 1977) (emphasis added).

■ A special circumstance may not be found if the underlying felony was "incidental" to the murder. The California Supreme Court has made clear that, in order for a special circumstance involving a felony to be present, the felony must be motivated by an "independent purpose—not merely incidental." *People v. Ochoa,* 19

Cal.4th 353, 79 Cal.Rptr.2d 408, 966 P.2d 442, 487 (1998). With respect to the special circumstance of robbery, the court has Stated that "[t]he Legislature's goal is not achieved ... when the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder[,] 'a second thing to it....' " *Green,* 164 Cal. Rptr. 1, 609 P.2d at 505. The rule derives from the court's unwillingness to "permit a jury to choose who will live and who will die on the basis of whether in the course of committing a first degree murder the defendant happens to engage in ancillary conduct that technically constitutes robbery or one of the other listed felonies...." *Id.*[9]

■ Essentially, the rule holds that if the motivation for the robbery is somehow wrapped up in the commission of the murder, the robbery is incidental. That is to say, if the intent to rob is formed after or during the course of the killing, the robbery will not support the finding of a special circumstance for the application of the death penalty. *See People v. Musselwhite,* 17 Cal.4th 1216, 74 Cal.Rptr.2d 212, 954 P.2d 475 (1998) ("[E]stablishing the felony-murder special circumstance includes showing [that] the intent to commit the underlying felony *precedes* the killing") (emphasis added). Here, if a "shoot-out" defense had been presented at trial, the jury might well have found that Phillips did not form the intent to steal until after the killing, thus necessitating the conclusion that special circumstance 190.2(c)(3)(i) did not apply to Phillips. In such case, Phillips could not have been sentenced to death.

In view of all these circumstances, we conclude that Phillips has raised a colorable claim of prejudice, a sufficient showing to entitle him to an evidentiary hearing on his ineffective assistance of counsel claim. We next proceed to a discussion of Phillips's claims relating to the presentation of false testimony by the key prosecution witness and the prosecutor himself. In so doing, we note that this next claim may also be relevant to and serve to bolster the prejudice question we have just been discussing.

## V. *Perjury Claims*

Phillips contends that Madera County District Attorney David Minier suppressed evidence of two plea agreements with Sharon Colman in which the State promised her leniency in exchange for her testimony implicating Phillips. Moreover, Phillips alleges that Colman committed perjury when she testified that she had not been promised any benefit in exchange for her testimony, and that Minier committed perjury when he testified that he had not communicated any promise of leniency or benefit to Colman. Moreover, he asserts that Minier knowingly used testimony by Coleman that he knew to be false.

Colman testified at Phillips's trial that she had never been promised any benefit in exchange for her testimony. Minier, too, testified under oath that he "never had an agreement with Sharon Colman concerning what, if anything, she would receive in return for her testimony." In his closing argument at Philips's guilt trial, Minier bolstered Colman's credibility by

9. As discussed *supra,* a provision that is identical in meaning though slightly different in language may serve as an alternate basis for a first-degree murder conviction. That provision States that a killing is murder in the first degree if it is committed "in the perpetration of" a robbery. Cal.Penal Code § 189

(Deering 1978) (effective 1970). "During the commission of" and "in the perpetration of" denote the same temporal and causal relationship. Thus, the California cases discussed in the text are equally applicable to the question of the alternate ground for a finding of first-degree murder.

emphasizing to the jury "that Miss Colman has never been promised anything in return for her testimony."[10]

■ Phillips points to several pieces of evidence that seriously undermine Minier's account. Colman's first attorney, Tom Peterson, testified in State postconviction proceedings that on December 28, 1977, Colman was interviewed at the Madera County jail by Minier and two Madera County detectives and told that nothing she said would be used against her. In return for Colman's testimony, Peterson testified, Minier agreed orally to a deal that would permit Colman to plead guilty to a violation of Penal Code Section 32 (accessory to murder) and to receive no more than one year of jail time. Finally, Peterson testified that he specifically recalled communicating the details of Minier's offer to Colman.

In a 1990 declaration, Minier acknowledged that he might have had an agreement with Peterson, but he explained that he was "sure that he would have expressly requested Mr. Peterson not convey the offer to Miss Colman; it was my habit and custom at that time to 'insulate' testifying accomplices from knowledge of the benefits they were to receive." Minier further testified that he did have an agreement with Colman's second attorney, Cassandra Dunn, regarding the benefit that Colman was to receive, but noted that there had been an "express understanding between Miss Dunn and me that she would not communicate the agreement to Colman." This testimony by Minier raises serious questions as to whether he committed perjury at Phillips's trial. Dunn, Colman's lawyer, was, as a matter of law, Colman's agent. When Minier made an agreement with Colman's agent regarding her testimony, it would appear to follow that he did in fact—contrary to his sworn testimony—have an agreement with Colman.

The district court properly characterized Minier's practice of "insulating" witnesses as "deplorable," but concluded nonetheless that Phillips was not entitled to relief, or even to an evidentiary hearing.[11] The court noted that Phillips's perjury claim had been "considered and rejected" by the Madera County Superior Court after an evidentiary hearing in 1990. While it is correct that the Superior Court rejected Phillips's claim, that court did *not* make a factual finding as to whether false testimony was proffered and, if so, whether it was knowingly done by Minier. It did not, in fact, determine whether Colman or Minier or both had committed perjury. Rather, the Superior Court based its conclusions on the determination that any error was harmless, because the issue of Colman's credibility and the possibility of a plea agreement were already before the jury. Thus, the facts underlying Phillips's allegations of perjured testimony have not yet been fully developed.

■ It is well settled that the presentation of false evidence violates due

---

10. Following her testimony and the imposition of a death sentence on Phillips, Colman was not charged with any crime.

11. We note that it was not only the prosecutor whose conduct was deplorable, but the second defense attorney as well. If Dunn indeed concealed from her client the existence of a plea bargain or immunity agreement, and allowed her client—who faced capital murder charges—to testify without any knowledge of the agreement she had reached on her behalf, she plainly violated her ethical duty to "keep [Colman] reasonably informed of significant developments" regarding her case, Cal. Bus. and Prof.Code § 6068(m), and failed to "explain [the] matter to the extent reasonably necessary to permit [Colman] to make informed decisions regarding [her] representation." Model Code of Professional Conduct Rule 1.4 (1983).

process. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ("[A] State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction...."); *United States v. LaPage*, 231 F.3d 488 (9th Cir. 2000) ("The due process clause entitles defendants in criminal cases to fundamentally fair procedures. It is fundamentally unfair for a prosecutor to knowingly present perjury to the jury."). If the false evidence is material—that is, reasonably likely to have affected the judgment of the jury—the defendant's conviction must be reversed. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1985). Here, the record reveals that Minier permitted Colman to testify that she did not expect to receive any benefit in exchange for her testimony, knowing that her testimony was highly questionable at best, and that he had twice promised such a benefit to Colman's attorneys. In any event, assuming, as we must for purposes of determining Phillips's entitlement to an evidentiary hearing, that Phillips's allegations that Colman actually knew of the promise and deliberately committed perjury are true, the question then becomes: Is there a reasonable possibility that Colman's and Minier's false testimony could have affected the judgment of the jury? Here, the answer requires a two-step analysis.

Although Phillips argued below that Colman's allegedly perjured testimony did affect the judgment of the jury, he concedes on appeal that it did not, because—in the context of his wholly meritless alibi defense—"the only issue at trial was whether Phillips was the shooter, and there was overwhelming evidence that Phillips was the shooter." Thus, Phillips now professes, "the jury would credit Colman's testimony on this narrow issue even if it was aware that Colman lied under oath about her ... plea bargain." Phillips

does *not* concede, however, that Colman's and Minier's allegedly perjurious testimony would have been non-prejudicial had counsel not been ineffective. In other words, he asserts that the allegedly perjured testimony would have been prejudicial if, at the trial, his counsel had presented a "shoot-out," rather than an alibi, defense. In short, Phillips specifically contends that the combined effect of his counsel's deficient performance and the presentation of false testimony was sufficiently prejudicial to warrant the granting of an evidentiary hearing.

## VI. *Cumulative Prejudicial Effect of the Two Errors*

We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted. *Mak v. Blodgett*, 970 F.2d 614, 622 (9th Cir.1992) (per curiam) (collecting cases). Here, we conclude that, regardless of whether his ineffective assistance of counsel claim would, standing alone, entitle him to an evidentiary hearing, Phillips has raised a colorable claim that the failure to present a "shoot-out" defense, when considered together with the false testimony that Colman and Minier allegedly presented, was sufficiently prejudicial to entitle him to that relief.

It was Colman's testimony, and principally hers, that provided the basis for the finding of premeditation and the special circumstance of murder during the commission of a robbery. Had the issue at trial been the circumstances of the shooting rather than the identity of the shooter, there would have been little, if any, corroboration of Colman's account. Although it is undisputed that Phillips took the wallets of the victims following the shooting, he now contends that he did so in order to remove their identification from the crime scene; the fact that thousands of dollars

remained in the victims' possession provides support for Phillips's allegation. Without Colman's testimony, the State would have been hard-pressed to explain why Phillips, in committing the special circumstance of robbery, left most of the victims' money behind at the scene. Colman's testimony, and thus her credibility, were therefore crucial to Phillips's eligibility for a death sentence. Had the jury concluded that, as her first lawyer's testimony strongly tends to establish, she lied under oath regarding the benefit she would receive in exchange for her testimony, its judgment might well have been affected.[12]

Considering the prejudice that might well have resulted if Phillips's claim of ineffective assistance of counsel proves to be valid (*see* discussion at IV.B.), together with the prejudice that might well have resulted from the use of Colman's false testimony, we conclude that Phillips has presented a colorable claim that the combined effect of the alleged constitutional violations is sufficiently prejudicial to meet the *Townsend v. Sain* standard.[13] Thus, we conclude that Phillips is entitled to an evidentiary hearing with regard to his claims that his counsel was ineffective and that the State presented false testimony.[14]

## VII. *Other Claims*

Phillips remaining claims are without merit and may be addressed succinctly.

### A. *Bad Faith Destruction of Evidence*

Phillips contends that the State acted in bad faith by permitting the destruction of the Ranchero truck in which Rose and Bartulis were shot, without providing notice to either Phillips or his attorney. Phillips's theory is that the Ranchero might have contained evidence supporting his claim that Bartulis was killed during a shoot-out.

 Absent a showing of bad faith on the part of the police, "failure to preserve potentially useful evidence does not

---

**12.** Although Phillips's counsel did attack Colman's credibility by arguing that there *appeared* to be a deal, the prosecution argued otherwise, and the jury was never informed that such a deal actually existed. More important, had the jury known that Colman *lied* about the existence of a deal, it might have been less willing to credit her testimony about other matters as well.

**13.** To put it differently, the State argues in part that counsel's failure to present the "shoot-out" defense is not prejudicial because it is contrary to the weight of the credible evidence offered at Phillips's trial. To the extent that Phillips has presented a colorable claim that Coleman's perjured testimony violated his constitutional rights, her testimony must be disregarded when evaluating prejudice with respect to the ineffectiveness of counsel claim. Thus, there is a direct link and a cumulative effect as to the two prejudicial errors.

**14.** Phillips also contends that he is entitled to a new trial on account of Minier's perjured testimony even absent a showing of prejudice. He argues that his is the "unusual case" contemplated by the Supreme Court in footnote nine of *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), in which "a deliberate and especially egregious error of the trial type, or one that is so combined with a pattern of prosecutorial conduct" as to "infect the integrity of the proceedings" warrants "the grant of habeas relief even if it did not substantially affect the jury's verdict." *Id.* at 638 n. 9, 113 S.Ct. 1710. We have previously explained that in evaluating whether "Footnote Nine" error has occurred, "the key consideration is whether the integrity of the proceeding was so infected that the entire trial was unfair." *Hardnett v. Marshall*, 25 F.3d 875, 879 (9th Cir.1994). In this case, it cannot be said that Minier's conduct rendered the entire trial unfair and warrants reversal of the conviction absent a showing of actual prejudice. Accordingly, the district court properly denied relief on this claim.

constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). Phillips makes no colorable showing, or indeed any showing at all, that the State destroyed the Ranchero to prevent disclosure of evidence favorable to the defense, nor is there any reason to believe that the exculpatory value of the Ranchero was apparent prior to its destruction. "The mere failure to preserve evidence which could have been subjected to tests which might have exonerated the defendant does not constitute a due process violation." *United States v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir.1997). Phillips has not met the requirements for an evidentiary hearing on this claim.

### B. *Brady Violations*

■ Phillips contends that the prosecution failed to disclose reports prepared by former Madera County Sheriff/Coroner Edward Bates and by the California Department of Justice concerning their examinations of the burnt-out Ranchero truck. Phillips asserts that the reports contain exculpatory evidence that would support his claim that it was Rose who shot Bartulis, and that the suppression of the reports violates the dictates of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In support of his allegation, Phillips introduced declarations to the effect that Bates had a practice of filling out reports describing the results of such examinations, and that the truck was delivered to the California Department of Justice by a towing service at the behest of the District Attorney's office.

The State maintains that the Ranchero was never examined by the Department of Justice (and thus no DOJ report exists), and that even if Sheriff Bates did prepare a report, it would not have contained any evidence favorable to Phillips. Although there is some evidence that would support Phillips's allegation that Bates did in fact prepare a report, the State is correct that absolutely no evidence supports Phillips's claim that such a report would have contained exculpatory evidence, and that claim is directly contradicted by Bates' own declaration.[15] As to Phillips's claim that the State suppressed a report by the California DOJ, the evidence that any report was in fact developed is tenuous, at best.[16] The district court did not err in characterizing Phillips's *Brady* claims as "mere suppositions," and Phillips is not entitled to a hearing to pursue them further.

### C. *Factual Innocence*

Phillips contends that he is "factually innocent" of the special circumstance found by the jury—that is, that Bartulis was murdered during the course of a robbery—because Rose, not he, fired the fatal shot, and because the robbery was "incidental to" the murder. Accordingly, Phillips argues, he is legally ineligible for a sentence of death. Assuming that a "truly persuasive demonstration of 'actual innocence' made after trial . . . would warrant federal habeas relief," the Supreme Court has stated that the threshold showing for such an assumed right would be extremely high. *Herrera v. Collins*, 506 U.S. 390, 400, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1992).

**15.** Bates attested that any report that he would have developed would not have included any exculpatory material because, in his opinion, none existed.

**16.** The record includes a declaration from a DOJ examiner who asserts that he was the only DOJ official to work on the case, that he never examined the Ranchero, and that the DOJ would not have accepted a car delivered by a towing service.

We need not determine whether Phillips's factual allegations raise a colorable claim of innocence under the standard that the Court has indicated would be necessary. The allegations that support Phillips's factual innocence claim are the same allegations that support his ineffective assistance of counsel and due process claims. We have already determined that those allegations entitle him to a hearing on the latter claims. Because the standard for obtaining relief on the basis of those claims is considerably less stringent than the standard for obtaining relief on a claim of factual innocence, Phillips's chances necessarily rise or fall with his ineffectiveness and due process claims. If Phillips is ultimately entitled to some relief on account of those claims, the factual innocence question need not be reached. If, on the other hand, Phillips fails to establish following an evidentiary hearing that he suffered sufficient prejudice regarding his other two claims, he certainly will not be able to establish his factual innocence. Accordingly, we decline to decide whether Phillips's claim of factual innocence might entitle him to relief.

### D. *Recusal on Remand*

 Phillips contends that, if the district court's decision is reversed, this court should order the case reassigned to a different judge. We have made clear that remand to a new judge is "not the usual remedy when error is found in district court proceedings. Remand to a new judge is reserved for 'unusual circumstances.'" *United States v. Arnett*, 628 F.2d 1162, 1165 (9th Cir.1979). Absent proof of personal bias, three factors determine whether a case should be remanded to a different judge: (1) "whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected; (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness." *Id.* at 1165 n. 5. Factors two and three are intertwined and require a weighing of interests. Factor one is independent, and is enough standing alone to require recusal.

 Having reviewed the record of proceedings below, we find no basis for concluding that the district judge will have difficulty being fair and impartial or that reassignment is advisable to preserve the appearance of fairness. Accordingly, we deny Phillips's request for reassignment to a different judge on remand.[17]

### VIII. *Conclusion*

We reverse the district court's grant of summary judgment to the State and remand for an evidentiary hearing on Phillips's claims regarding the ineffectiveness of his trial counsel and the prosecution's presentation of false testimony. We reject Phillips's remaining claims for relief.

REVERSED IN PART AND REMANDED.

KLEINFELD, Circuit Judge,
dissenting:

I concur in those portions of Part VII of the majority opinion that reject Phillips'

---

**17.** Phillips also contends that the cumulative prejudicial effect of all the violations of his federal constitutional rights which occurred at the 1980 guilt trial entitles him to relief. We have already determined that Phillips is entitled to a hearing with regard to the combined prejudicial effect of counsel's ineffective performance and the prosecution's presentation of false testimony. Phillips's remaining claims do not entitle him to any relief, either individually or cumulatively.

claims but otherwise dissent. The majority makes three major and independent errors: (1) it grants an evidentiary hearing on a claim not developed in state court, despite the Supreme Court's reversal in *Keeney v. Tamayo–Reyes*[1] of a similar error our court had made; (2) it treats counsel's defense of alibi, made at his client's insistence and despite counsel's recommendation against it, as ineffective assistance, despite our decision to the contrary in *Bean v. Calderon;*[2] and (3) it treats Phillips' supposed ineffective assistance and perjury claims as cumulatively prejudicial based on a hypothetical trial that never occurred, instead of evaluating materiality of perjury and prejudice based on the trial that actually took place.

Phillips lured two men to a vacant area off a freeway exit ramp with a lie that his brother (who did not exist) would sell them some stolen insulation. He told them to "get as much cash together as [they] could." Phillips and his girlfriend drove one car, the two men another. When the two cars stopped at a gas station on the way to the supposed rendezvous, Phillips borrowed a book of matches from one of the men even though he did not smoke and doubtless could have obtained matches at the gas station. When they stopped off the freeway ramp, Phillips shot both men at close range, killing one instantly. He stole their wallets and complained to his girlfriend that he could not find the money they were supposed to have on them. Then he poured gasoline on them and, probably with the matches he had bor-

rowed from them, set them and their car on fire. One of the men, despite being shot and set on fire, escaped from the burning car. Phillips complained to his girlfriend that he "wasn't dead" and ran the man down with his car, trying yet again to kill him. But this bleeding, burned, and maimed man did not die. He survived and testified at Phillips' murder trial, along with Phillips' girlfriend.

Phillips committed this murder and attempted murder on December 7, 1977, twenty-four years ago. In 1980, twenty-one years ago, the people of California tried, convicted, and sentenced Phillips to death for first degree murder with the special circumstance of robbery. Phillips has now avoided the death penalty for more than two decades. His latest angle is that his lawyer gave ineffective assistance of counsel because he presented the alibi defense Phillips insisted on, lying to his lawyer and the jury, instead of the "shoot-out defense" Phillips has now concocted. The majority buys this nonsense, so Phillips will stave off the punishment two juries imposed for many years to come.

I doubt the majority is correct that pre-AEDPA law applies. Phillips filed his amended petition after the AEDPA went into effect.[3] But our decision on whether a post-AEDPA petition may be adjudicated under pre-AEDPA law when a petitioner has a different petition pending on different issues is *dicta*, because the government does not contest the issue. And because the government does not contend

---

1. 504 U.S. 1, 5, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

2. 163 F.3d 1073, 1082 (9th Cir.1998).

3. The majority states that "[i]n these circumstances, we treat Phillips' amended petition ... as part of his earlier, erroneously dismissed petition, and apply pre-AEDPA law," citing *Williams v. Calderon*, 83 F.3d 281, 285

(9th Cir.1996). *Williams* stands for the proposition that if a petitioner loses under pre-AEDPA law, the court need not decide whether the AEDPA applies. *Id.* at 285–86. The district court applied pre-AEDPA law to Phillips' petition on this basis. Since the majority decides Phillips *wins* under pre-AEDPA law, *Williams* does not control.

that the AEDPA should apply, I proceed, like the majority, to apply pre-AEDPA law.

The majority holds that Phillips is entitled to an evidentiary hearing because he has made colorable claims of ineffective assistance of counsel, perjury, and cumulative error. When Phillips talked to his lawyer and went to trial, he insisted, against his lawyer's advice, on an alibi defense. Phillips now says it was all a lie. He admits that he *was* at the scene, he *did* shoot at the men, he *did* set them on fire, and he *did* run down the survivor with his car. Decades after his trial, the majority now grants Phillips an evidentiary hearing on whether his lawyer incompetently failed to present a "shoot-out defense." There is no such defense, except perhaps in Hollywood action movies, because the law does not permit shoot-outs.[4] One may claim "self-defense," but even Phillips lacks the chutzpah to claim he shot two men, set them on fire, and ran down the survivor with his car, in self-defense. He only makes the more modest claim that they had a "shoot-out" and he won.

In two decades of litigation Phillips has presented many claims in many papers, including claims of ineffective assistance of counsel. He now gets the benefit of the now common but highly unlikely assumption that juries impose death penalties because of bad lawyers, rather than bad crimes. Phillips demands, and gets, relief because he says he had a bad lawyer, even though he admits to shooting, burning, and maiming two men, and successfully killing one of them without justification. And the majority now expands the notion of "bad lawyer" to include one who accepts his client's story, investigates it, and even finds corroboration for it, rather than pre-senting a different, conflicting story in the face of his client's insistence. The people of California condemned Phillips to die for his crimes, not for his lawyer, and we have no proper basis for granting relief, including the preliminary relief of yet another evidentiary hearing, decades after everyone's memory and notes are stale.

## I. Cause and Prejudice

As the majority concedes, Phillips told his lawyer that he was not even present at the crime scene, but was instead at a meeting of drug dealers somewhere else. He would not tell his lawyer who or where the people at the claimed meeting were. His lawyer told him this alibi defense did not have much chance of prevailing if Phillips did not disclose where and with whom he spent his time while someone else committed the brutal crimes. But Phillips insisted on the alibi and the lawyer investigated it, even finding a witness whose observations gave the alibi a little bit of corroboration. Now the majority grants Phillips relief on the theory that his lawyer should have discovered and presented a "shoot-out defense" instead. The question that has to occur to anyone reading a case twenty-four years old has to be, "Why didn't Phillips mention before now that his alibi was a lie, and that his lawyer was a dunce for not presenting his shoot-out defense?" Phillips knew he was lying from the start, and knew his lie was unsuccessful in 1980, but he did not claim ineffective assistance on this ground until 1991, ten years after he perjured himself with his false alibi at trial. He has shown no good cause for failing to develop this ineffective assistance theory in state court, so under controlling Supreme Court authority, *Keeney v. Tamayo–Reyes*,[5] and our decision in

---

4. *People v. Bolden,* 71 Cal.App.4th 730, 84 Cal.Rptr.2d 111, 117 (1999) (noting the general rule that a person engaged in mutual combat may not claim self-defense).

5. 504 U.S. 1, 11, 112 S.Ct. 1715, 118 L.Ed.2d

*Correll v. Stewart,*[6] he is not entitled to a federal evidentiary hearing on this theory now.

Phillips has already had two state court evidentiary hearings on post-conviction claims for relief. He had one hearing on a claim of ineffective assistance of counsel, on the theory that his lawyer did not know how many peremptory jury challenges were available. He lost. In a second state habeas petition, Phillips claimed that the government failed to disclose exculpatory evidence (evidence Phillips claims supports his "shoot-out defense") and that his girlfriend and the prosecutor perjured themselves, and got another evidentiary hearing in 1990. Phillips lost again. The court found Phillips already had this "exculpatory" evidence. Phillips did not develop the facts of his present claim, that his lawyer incompetently failed to present the "shoot-out defense," in either of these hearings. Yet he knew from the first moment he told his lawyer that he had an alibi that he was lying, and he knew from the first moment that his lawyer presented his alibi to the jury that it was a false defense. And he knew from the first verdict that his alibi defense was not only a lie but an unsuccessful lie. Yet he has shown no cause for failing to develop his current theory of ineffective assistance of counsel, that counsel should have presented a "shoot-out defense," when the state granted him the first or the second of his evidentiary hearings.

In *Keeney v. Tamayo–Reyes,* the Supreme Court reversed this court's holding that a habeas petitioner who insufficiently developed a claim in state court was entitled to an evidentiary hearing unless he had deliberately bypassed the orderly procedures of state courts.[7] The Court held that the proper standard is "cause" and "actual prejudice."[8] A petitioner is only "entitled to an evidentiary hearing if he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure."[9] The only cause Phillips can show for his failure to develop the facts of his present ineffective assistance "shoot-out defense" claim in state court is that when he litigated his first state habeas petition over a decade ago, alibi was his story and he was sticking to it. Nor can Phillips meet "the narrow exception" that "failure to develop a claim in state court proceedings will be excused and a hearing mandated if [a petitioner] can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing."[10]

In *Correll v. Stewart,* we denied an evidentiary hearing in circumstances analogous to this case.[11] The prisoner raised an ineffective assistance claim in state court based on one theory, that his lawyer should have developed a mens rea defense, but not on his other theory, that his lawyer botched his misidentification defense.[12] The state court summarily denied his claim.[13] When the prisoner sought a federal evidentiary hearing on an ineffective assistance claim based on the "botched misidentification defense theory," we held

318 (1992).

**6.** 137 F.3d 1404, 1411 (9th Cir.1998).

**7.** 504 U.S. 1, 4, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992).

**8.** *Id.* at 11, 112 S.Ct. 1715.

**9.** *Id.*

**10.** *Id.* at 11–12, 112 S.Ct. 1715.

**11.** 137 F.3d 1404, 1411–12 (9th Cir.1998).

**12.** *Id.* at 1410.

**13.** *Id.*

that *Keeney v. Tamayo–Reyes* barred relief—even though the state court summarily denied all of his claims without any evidentiary hearing—because he "had access to all the necessary information for raising this issue and for conducting a state-court evidentiary hearing" but did not raise the claim when he raised his other ineffective assistance claim.[14]

Like the prisoner in *Correll,* Phillips raised an ineffective assistance claim in state court based on one theory, his lawyer's ignorance about peremptory jury challenges, but not on his other theory, that the lawyer should have presented a "shoot-out defense." As in *Correll,* Phillips knew the facts needed to present this theory when he presented his other theory, because he had always known he was lying. And likewise, Phillips must show adequate cause for failing to raise this theory of ineffective assistance when he raised his other theory. But the only cause Phillips can show—his belief that the benefits of lying outweighed the benefits of telling the truths—is not adequate, because trials do not exist to test which lie works better, but to find the truth.

The majority attempts to avoid *Correll* by noting that Phillips raised his "shoot-out defense" theory in later state court petitions and was not granted a hearing on it. But that begs the question of why he did not raise it when he *was* granted a hearing, the first time on his other ineffective assistance claim, and the second time on his other claims. The majority then claims *Correll* justifies its result, quoting a different section discussing the prisoner's claim of ineffective assistance at sentencing based on his lawyer's almost total failure to mount a defense.[15] The prisoner had raised this specific claim in state postconviction proceedings, but the state court summarily dismissed the petition despite the prisoner's "proper request" for an evidentiary hearing.[16] We held that adequate cause was shown where the petitioner "tried and failed *through no fault of his own* to develop the facts relevant to his ineffective assistance claim at the state-court level."[17] Phillips did not fail to develop his claim "through no fault of his own." He was at fault, because he was sticking to his lie.

## II. Ineffective Assistance of Counsel

If a petitioner's allegations, even if proved, would not entitle him to relief, he does not raise a colorable claim and is not entitled to an evidentiary hearing.[18] Phillips' theory that his lawyer rendered ineffective assistance by failing to present his "shoot-out defense" is not a colorable claim under the controlling precedents of *Turk v. White*[19] and *Bean v. Calderon.*[20] *Turk* holds that once defense counsel reasonably selects a theory of defense, he cannot be held to have rendered deficient performance under *Strickland v. Washington*[21] for failing to investigate or present an alternative defense that would have been inconsistent with the defense presented.[22]

---

**14.** *Id.* at 1412.

**15.** *Id.* at 1412.

**16.** *Id.* at 1413.

**17.** *Id.* at 1414 (quoting *Jones v. Wood,* 114 F.3d 1002, 1012–13 (9th Cir.1997) (emphasis added)).

**18.** *See Rich v. Calderon,* 170 F.3d 1236, 1239 (9th Cir.1999); *Correll,* 137 F.3d at 1411.

**19.** 116 F.3d 1264 (9th Cir.1997).

**20.** 163 F.3d 1073 (9th Cir.1998).

**21.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**22.** *Turk,* 116 F.3d at 1266–67.

*Turk* goes to investigation, not just presentation, and holds that a lawyer does not have to investigate an alternative defense before rejecting it.[23]

The notion that an ineffective assistance claim could be based on counsel's decision to present the alibi the client insisted on, instead of another defense, was laid to rest by *Bean v. Calderon*.[24] In *Bean*, as in this case, the prisoner lied to his lawyer and the jury, claiming that he was not at the scene of the crime.[25] He asserted his false alibi to his lawyer, and stuck to it, even though it was perhaps even weaker than the false alibi defense in this case.[26] Then he sought habeas relief on the ground that his lawyer rendered ineffective assistance by presenting an alibi defense instead of a defense of diminished capacity.[27] We held that the lawyer reasonably chose to present the alibi defense because the prisoner told his lawyer he was not there and refused to accept an alternative defense, diminished capacity.[28] And "because the diminished capacity defense would have conflicted with the alibi theory, it was within the broad range of professionally competent assistance" for the lawyer not to investigate or present it.[29] That is controlling, but the majority fails to follow it, so we now have an intra-circuit conflict of authority on whether a lawyer renders ineffective assistance by presenting an alibi defense that the client insists on and not investigating alternative defenses inconsistent with alibi.

The majority attempts to distinguish *Bean* and *Turk* on the ground that Phillips' lawyer did not select the alibi defense based on a reasonable investigation. But Phillips' lawyer *did* investigate, and even found a witness whose observation of an armed man other than Phillips making arguably self-incriminating remarks tended to corroborate the alibi. And he sensibly advised Phillips that an alibi was unlikely to succeed where the defendant refused to say where he was or with whom.

The majority makes a disturbing misuse of precedent, by purporting to rely on *Johnson v. Baldwin*.[30] We held in *Johnson* that the presentation of a patently false alibi prejudiced a rape defendant, because his obviously false alibi testimony undercut the uncontradicted scientific evidence that showed he was factually innocent of the rape.[31] The reason that the majority's reliance on *Johnson* is a disturbing misuse of precedent is that in *Johnson*, we expressly avoided considering whether counsel's performance was deficient.[32] Yet today's majority opinion treats *Johnson* as though it were precedent for the majority's extraordinary deficient performance holding. The state had conceded deficient performance under *Strickland*, so "the sole issue in this appeal" was whether the false alibi prejudiced the defendant, not whether the lawyer reasonably investigated the alibi.[33] When we say "the sole issue on appeal" is B, because issue A is conceded, that means

**23.** 116 F.3d at 1267.

**24.** 163 F.3d 1073, 1082 (9th Cir.1998).

**25.** *Id.* at 1075–76.

**26.** Bean's fingerprints were found at the murder scene and he confessed the crime to a witness. *Id.* at 1075.

**27.** *Id.* at 1081.

**28.** *Id.* at 1082.

**29.** *Id.*

**30.** 114 F.3d 835, 840 (9th Cir.1997).

**31.** *Id.* at 838–840.

**32.** *Id.* at 838.

**33.** *Id.*

that the case does not stand for anything at all on A. There is no reason to think that the split decision in *Johnson* would have come out the same way had deficient performance not been conceded.

The majority asserts that *"Johnson*'s precedential value is not limited to the question of prejudice" because the court "necessarily evaluated counsel's performance ... in determining [prejudice]" and concluded that counsel's performance was "objectively deficient."[34] That is precisely wrong. Because deficient performance was conceded in *Johnson*, and we limited our decision to what we said was "the sole issue on appeal," prejudice, we necessarily did *not* evaluate counsel's performance and determine that it was deficient.[35] We found prejudice because the false alibi defense vitiated the force of the scientific evidence defense, that the two alleged rapists who were supposed to have ejaculated at least twice had left no sperm or semen.[36]

The majority also claims that Phillips' lawyer did not make a reasonable investigation because he testified in a post-conviction hearing that he would have presented the "shoot-out defense" had he only possessed certain documents, documents he in fact did possess.[37] Subsequently the lawyer corrected this account, when his recollection was refreshed by additional material petitioner's counsel had not fur-

nished to him when the helpful testimony had been obtained. Because evidentiary hearings on post-conviction relief petitions occur years after the events, they often introduce error on account of fading memory and partial records. The majority errs in two ways. First, the lawyer's hindsight subjective assessment of his performance does not establish whether "counsel's representation fell below an objective standard of reasonableness" "as of the time of counsel's conduct."[38] Second, even if the lawyer possessed but did not review evidence supporting a "shoot-out defense," his failure to investigate the "shoot-out defense" has no bearing on whether he reasonably investigated the *alibi* defense. Under *Bean* and *Turk*, a lawyer does not have to investigate alternative defenses and then choose one; instead, once he reasonably investigates one defense, his duty to investigate any other defense ends.[39]

*Bean* is precisely analogous to this case. Phillips insisted on his alibi defense, telling his lawyer that he was not at the scene of the crime, despite his lawyer's strong recommendation that it was unlikely to be effective. We cannot treat the lawyer's decision to present the alibi defense as deficient under *Strickland v. Washington*[40] when we held the same decision was not deficient in *Bean*.[41] In this case, Phil-

---

**34.** Maj. Op. at 979 (quoting *Johnson,* 114 F.3d at 840).

**35.** Even if one misread *Johnson* to have some bearing on deficient performance, it would be distinguishable from *Bean* because counsel in *Johnson* apparently made *no* investigation of the defendant's alibi. *Johnson,* 114 F.3d at 839. Here, as in *Bean,* Phillips' lawyer reasonably investigated the alibi under the circumstances, the most important circumstance being Phillips' insistence on the alibi.

**36.** *Johnson,* 114 F.3d at 838–840.

**37.** Maj. Op. at 977, n.5.

**38.** *Strickland v. Washington,* 466 U.S. 668, 688, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**39.** *Bean v. Calderon,* 163 F.3d 1073, 1082 (9th Cir.1998); *Turk v. White,* 116 F.3d 1264, 1266–67 (9th Cir.1997).

**40.** 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**41.** *Bean,* 163 F.3d at 1082.

lips' lawyer at least found some support for an alibi defense, a witness who testified that the day after the murder, a man other than Phillips carrying a .45 caliber handgun claimed he saw or was involved in a gun battle at the scene of the murder. That is pretty good corroboration for a false alibi, much better than anything counsel in *Bean* had. Following *Strickland*'s admonition that "the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," [42] we held in *Bean,* following *Turk,* that counsel did not even have to investigate the alternative theory. [43] "Once [defense counsel] reasonably chose that theory, largely on the basis of Bean's own representations, his duty to investigate the directly conflicting diminished capacity defense was at an end." [44] That is a holding on all fours with this case, and controls it. A defendant himself has some responsibility for the quality of the legal representation he receives. [45] If a defendant lies to his lawyer, and his case suffers because it is based on that lie, the defendant himself bears some or all of the responsibility for the deficiency. [46]

## III. Perjury and Cumulative Error

The majority's analysis of perjury and cumulative error is directed to a hypothetical trial that never occurred, not Phillips' actual trial. At trial, Phillips' girlfriend contradicted his alibi, so he tried to impeach her by showing that she was perjuring herself in exchange for lenience from the government. But he now admits that his alibi testimony was a lie, the perjury was his, and the majority is forced to concede that the girlfriend's alleged perjury about her plea bargain did not affect the jury's verdict. In response to Phillips' cross-examination, she testified that she expected "consideration" for her testimony but not a "benefit," a fine distinction indeed. The prosecutor also testified that he had not "communicated" a deal to the girlfriend, because he had a bizarre practice of making deals with defense counsel but instructing them not to tell their clients. This let his witnesses deny that, to their knowledge, they had a deal. Phillips says the prosecutor and his girlfriend both committed perjury, on the theory that they really had a deal, and she should be "deemed" to have agreed to a deal, whether she knew about it or not, because her lawyer had agreed to it.

Now for the majority's cumulative error argument, which gets hypothetical to the point of "if my grandmother had wheels, she would be a bus." The majority proceeds on the assumption that if Phillips'

42. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

43. *Bean,* 163 F.3d at 1082.

44. *Id.*

45. *See, e.g., Moore v. Johnson,* 194 F.3d 586, 605–606 (5th Cir.1999) (rejecting an ineffective assistance claim based on counsel's presentation of a false alibi because the defendant was "presumed to be the master of his own defense" and "maintained his innocence and endorsed the alibi defense" in trial, direct appeal, and state habeas proceedings).

46. *See, e.g., Tyson v. Keane,* 159 F.3d 732, 736 (2d Cir.1998) (rejecting an ineffective assis-

tance claim where the "principal reason" counsel pursued the " 'wrong' defense strategy" was the defendant's "own conduct, whether characterized charitably as lack of candor or as a lie"); *Brewer v. Aiken,* 935 F.2d 850, 859–60 (7th Cir.1991) ("It would be absurd to create a rule allowing a defendant to go free if perjured testimony succeeds while at the same time providing for a new trial if the witness is a poor liar. Thus, we refuse to hold that the presentation of perjured testimony at the request of the defendant is adequate to constitute ineffective assistance of counsel.").

lawyer had been minimally competent, he would have tried the case on the "shoot-out" theory instead of the alibi Phillips insisted on. Then the majority assumes that in this hypothetical trial that never happened Phillips' girlfriend and the prosecutor would have given exactly the same testimony about her deal. The idea is that in that hypothetical trial Phillips would have been prejudiced because the imaginary perjury would have prevented him from impeaching his girlfriend's testimony, and that would have weakened his never-presented "shoot-out defense" and his defense that he did not kill the men to rob them, but only stole their money incidentally, as an afterthought, when he was stealing their identification. Chutzpah indeed!

Phillips' cumulative prejudice theory has a fatal flaw in addition to its failure to pass the straight face test: the prejudice only happened in an imaginary case in which Phillips would have supposedly presented a "shoot-out defense," not the case actually tried. The claimed prejudice never happened, because the case presenting a "shoot-out defense" never happened. Thus the case for which the "I'm expecting consideration" testimony was supposedly prejudicial and perjurious never was tried. Materiality and prejudice must occur in the case that was tried, not in an imaginary case.

Who knows what witnesses might have testified and how they might have been impeached if Phillips had told the truth? A habeas petition has to be based on constitutional error in the trial that occurred, not a trial that was prevented by the defendant's own perjury. The requirement

of prejudice means actual prejudice in an actual trial,[47] as opposed to imaginary prejudice in an imaginary trial.

The people of California did not sentence Phillips to death because he had a bad lawyer. They sentenced him to death for his crimes on December 7, 1977. I dissent.

---

47. *See, e.g., Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (habeas claim based on trial error must establish "actual prejudice"); *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("Even if a defendant shows that particular errors of counsel were unreasonable ... the defendant must show that they actually had an adverse effect on the defense.").